## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| NEAL T. HOWLETT, | ) | CASE NO. 5:16CV01245 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Neal T. Howlett ("Plaintiff"), challenges the final decision of Defendant, Nancy

A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"), denying his

applications for Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under

Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for

preparation of a Report and Recommendation.  For the reasons set forth below, it is

recommended that the Commissioner's final decision be AFFIRMED.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

## I. PROCEDURAL HISTORY

Plaintiff had previously filed an application for DIB and SSI on February 26, 2007. (Transcript ("Tr.") 83).  An ALJ held a hearing, and, on January 29, 2010, the ALJ issued an unfavorable decision.  (Tr. 80).  After the Appeals Council denied review, Plaintiff sought review in U.S. District Court, and, on September 28, 2012, the decision of the Commissioner was affirmed. (Tr. 103).

On October 16, 2012, Plaintiff filed additional applications for POD and DIB alleging a disability onset date of January 30, 2010.  The applications were denied initially and upon reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ"). (Tr. 161).  On October, 23, 2014, an ALJ held a hearing, during which Plaintiff, represented by counsel, and an impartial vocational expert ("VE"), testified.  (Tr. 37-79).  On October 29, 2014, the ALJ issued a written decision finding Plaintiff was not disabled.  (Tr. 10-32).  The ALJ' s decision became final on March 24, 2016, when the Appeals Council declined further review. (Tr. 1-3).

On May, 24, 2016, Plaintiff filed his complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 10, 14, 15). Plaintiff asserts a single assignment of error:

- Whether the ALJ failed to give appropriate weight to the opinion of Plaintiff's treating physician, Heather Queen-Williams, M.D.

(Doc. No. 10).

2

## II. EVIDENCE

A.      **Personal and Vocational Evidence**

Plaintiff was born in 1955.  (Tr. 189).  He has a twelfth grade education and is able to communicate in English.  (*Id.*)  He has past relevant work as a production machine tender.  (Tr. 74-75).

B.      **Medical Evidence**

Plaintiff presented for a psychiatric evaluation on July 17, 2007.  (Tr. 282).  He reported no suicidal or homicidal ideation.  (Tr. 282).  He was diagnosed with bipolar disorder, assigned a GAF score of 45, and prescribed Lamictal and Seroquel.  (Tr. 284).

From October 26, 2009 to November 26, 2012, Plaintiff was treated by Jeanette Moleski, M.D.  (Tr. 349-372, 373-403).  Plaintiff reported sleeping two to four hours a night, and he complained of experiencing auditory hallucinations.  (Tr. 401).  Several treatment notes indicate that, on examination, Plaintiff had normal insight and judgment, orientation as to time, place, person, and remote memory, and no evidence of depression, anxiety, or agitation.  (Tr. 374, 370, 377, 387, 390, 396).  On other occasions, Dr. Moleski noted depression, anxiety, anger issues, and manic episodes.  (Tr. 349, 359, 352, 365, 376, 381, 383, 386, 389, 398, 395, 392, 373).  In August 2010, Dr. Moleski indicated that Plaintiff was "almost involved in a road rage," but she observed that his bipolar disorder was "mostly under control."  (Tr. 386).  In March 2011, Dr. Moleski noted that Plaintiff was agitated because he did not like the television station that was on in the waiting room.  (Tr. 381).  Dr. Moleski diagnosed Plaintiff with bipolar disorder.  (Tr. 373-403).

3

Throughout 2012, Plaintiff received psychiatric care from Heather Queen-Williams, M.D.  During this period, she diagnosed him with bipolar disorder (mildly depressed), PTSD, and mild psychosocial issues with a GAF scores of 50-55.  (Tr. 317-18; 320, 323).

During a January 2012 visit, Dr. Queen-Williams noted that Plaintiff had been "a little hypomanic"; that he had been working at a daycare in Cleveland four days a week; and that he had said a few inappropriate things at the daycare, for which he later apologized.  (Tr. 322). Plaintiff reported that he would continue with Mental Health Court and intensive Community Resource Services.  (*Id.*).  He was diagnosed with bipolar I, mildly depressed and PTSD.  He was experiencing moderate psychosocial and environmental stressors, and he was continued on his medications.  (Tr. 323).

Treatment notes from February 2012 indicate that Plaintiff had been "doing OK"; that he was experiencing more of a euthymic mood; that he was no longer manic; that his thoughts were not racing; that he was finishing school in Cleveland; that he was still working at the daycare; and that he was volunteering for Habitat for Humanity.  (Tr. 319).  May 2012 treatment notes prepared by Dr. Queen-Williams show that Plaintiff was "a little hypomanic"; that he was still working at the daycare; that he was volunteering at a church, garden club, and a few other places; and that he was sleeping normally.  (Tr. 316).

In July 2012, Plaintiff reported that he was doing landscaping work and was working at the daycare; and that he wanted to graduate early from the Mental Health Court.  (Tr. 313).  In September 2012, Plaintiff complained that he had been manic with increased energy and racing thoughts; and that he had been working for a political campaign.  (Tr. 310).  The treatment note indicates he "was hoping his girlfriend wasn't pregnant now" and that he "tries to fix broken

4

people."  (Tr. 310).  On examination, Dr. Queen-Williams noted no signs of depression, anhedonia, anxiety, euphoria, or anger.  (Tr. 311). His affect was full; thought process was intact; though content was within normal limits, with an absence of suicidal ideation; perception was normal; and he was not dangerous to himself or others.  (*Id.*).

In November 2012, Plaintiff presented to Dr. Queen-Williams.  He reported that he had recently had eye surgery, and he complained about how he was treated.  (Tr. 307).  He also stated that he had been verbally abusive to the staff at the daycare.  (*Id.*).  He was told not to come back to work until he got a doctor's note that he could return.  (*Id.*).  The treatment note indicates that Plaintiff had been out of Abilify for two weeks.  (Tr. 309).  He presented with mixed symptoms, poor judgment, and a spontaneous and distrustful demeanor.  (*Id.*).  His doctor opined that he was not ready to return to work due to poor judgment and because he was off his medication.  (*Id.*).

Plaintiff was again seen by Dr. Queen-Willliams in February 2013.  (Tr. 405-408).  He had recently completed Mental Health Court, and he had been compliant with the program.  (Tr. 405).  His doctor indicated that he had experienced hypomanic and possibly manic episodes, but with the support from the Mental Health Court he was able to avoid hospitalization.  (*Id.*).  Plaintiff told Dr. Queen-Williams that "he could solve the world's problems by having a baby with a dancer he met."  His doctor noted that Plaintiff "gets more promiscuous, has grandiose ideas, racing thoughts, begins to dress differently, has racing thoughts, talks fast, and has poor judgment."  (*Id.*).  She diagnosed bipolar I disorder (most recent episode depressed, mild); PTSD, moderate to severe psychosocial problems; and a GAF score of 50.  (Tr. 407).

From February 21, 2013 to August 8, 2014, Plaintiff received counseling at Community

5

Support Services.  (Tr. 450-486, 497-503).  Treatment notes indicate that Plaintiff needed to be redirected and that he was anxious during examination (Tr. 497, 499, 503); and that he presented as hypomanic or exhibited hypomanic symptoms.  (Tr. 452, 457, 462, 467, 470. 475).  Plaintiff was diagnosed with bipolar disorder and PTSD.  He was experiencing moderate to severe psychosocial problems.  He was assigned a GAF score of 45-50.  (Tr. 452-53; 457-58; 462-463; 467, 472-73, 478).

**C.      Opinion Evidence**

On December 11, 2012, state agency psychologist, Roseann Umana, Ph.D., reviewed the record, and on March 25, 2013, Robyn Hoffman, Ph.D., reviewed the record on reconsideration.  (Tr. 133-34, 143-44).  Both psychologists opined that Plaintiff had mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  (Tr. 133, 143).  They opined that Plaintiff had no repeated episodes of decompensation, each of extended duration.  (*Id.*)  Both psychologists adopted the residual functional capacity determination of the previous ALJ in his January 2010 decision.  (Tr. 135, 145).

Dr. Queen-Williams filled out a mental impairment questionnaire on April 22, 2013.  (Tr. 410-415).  She opined that Plaintiff had a fair prognosis, but that Plaintiff was unable to meet competitive standards with respect to most categories of mental abilities and aptitudes needed to do unskilled work[2] and all categories of mental abilities and aptitudes needed to do semi-skilled

---

[2]      These include remembering work-like procedures; maintaining attention for two hour segment; maintaining regular attendance and being punctual within customary, usually strict tolerances; sustaining an ordinary routine without special supervision; working in coordination with or proximity to others without being unduly distracted; completing a normal workday and workweek without

and skilled work.[3]  (Tr. 413).  Dr. Queen-Williams further opined that Plaintiff "likes to work but has difficulty around other people.  His mood changes also interfere with decision making."  (*Id.*).

She further opined that Plaintiff had mild restrictions in activities of daily living; marked difficulties in maintaining social functioning; extreme difficulties in maintaining concentration, persistence, or pace; and four or more episodes of decompensation within 12 month period, each of at least two weeks duration.  (Tr. 414).  She opined that as a result of his impairments, Plaintiff would be absent from work more than four times per month.  (Tr. 415).

**D.**    **Hearing Testimony**

During the hearing, Plaintiff testified to the following:

- Plaintiff testified that his bipolar disorder and PTSD had continued to prevent him from performing full-time work on a consistent basis because he would "hit the boundary" of his manic or "high" phase and would likely make too many mistakes in his job duties.  (Tr. 70-71).

- He testified that he had cycles of hypermania, which continued to affect him at least one day per week.  (Tr. 54).

- He stated that his mental state at the hearing was "a little high."  *Id.*

- He testified that less frequently, he was in a depressed state, which generally entailed sleeping, eating, or watching television.  (Tr. 69).

---

interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length fo rest periods; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; responding appropriately to changes in a routine work setting; dealing with normal work stress.  (Tr. 412).

[3]    These include understanding and remembering detailed instructions; carrying out detailed instructions; setting realistic goals or making plans independently of others; and dealing with stress of semiskilled and skilled work.  (Tr. 413).

- Plaintiff testified that he completed a two-year, court-ordered mental health program in 2010-2012.  (Tr. 51).

- He described himself as "crazy."  (Tr. 50).  He testified that his PTSD made him hypervigilant, caused him difficulty interacting with other men, and had at times pushed him to violence.  (Tr. 72).  He testified that he believed his PTSD was worse than his bipolar disorder, because it could not be improved through medication.  *Id.*

The VE testified that Plaintiff had past work as a production machine tender.  (Tr. 74).

The ALJ then posed the following hypothetical question:

> Let's assume an individual who can do a range of work at all exertional levels.  We'll just have mental limitations, and that's simple, routine, and repetitive tasks; low to average but no fast or strict production-rate pace or quota; simple work-related decision making.  In terms of contact with others -- occasional contact with supervisors; infrequent and superficial with both coworkers and the public.  A low-stress, static environment.  No type of conflict resolution, arbitration, or negotiating.  And even that interaction with coworkers would limited cooperative tasks.  The individual could be in proximity of others but no direct contact would be required, particularly with the public. And then there would be infrequent changes in the actual work tasks, and those changes would be gradually introduced.

The VE testified the hypothetical individual would not be able to perform past work.  (Tr. 75).  However, the VE explained the hypothetical individual would be able to perform other representative jobs in the economy, such as industrial cleaner, hospital cleaner, linen room attendant.  (Tr. 76).

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

8

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he/she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).

Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education

9

or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).

Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f).

For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant last met the insured status requirements of the Social Security Act on December 31, 2012.

2.  The claimant did not engage in substantial gainful activity during the period from his alleged onset date of January 30, 2010 through his date last insured of December 31, 2012 (20 CFR 404.1571 et seq.).

3.  Through the date last insured, the claimant had the following severe impairments: bipolar disorder and posttraumatic stress disorder ("PTSD") (20 CFR 404.1520(c)).

4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations:

    •  Can perform only simple, routine, and repetitive tasks that involve only simple work-related decision-making;

    •  Can have only occasional interaction with supervisors, can have only infrequent and superficial interaction with co-workers and the public,

10

and can be in proximity to others but cannot have any requirement of direct contact with others as a part of the job, particularly with the public; and

- Can tolerate only "low stress" work, defined as follows: a static work environment with infrequent changes in work tasks that must be gradually introduced; low to average (i.e., no strict or high) production-rate pace or quotas; limited cooperative tasks; and no conflict resolution, arbitration, or negotiation.

6.  Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on October 7, 1955 and was 57 years old, which is defined as an individual of advanced age, on the date last insured (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Through the dated last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.  The claimant was not under a disability, as defined in the Social Security Act, at any time from January 30, 2010, the alleged onset date, through December 31, 2012, the date last insured (20 CFR 404.1520(g)).

(Tr. 16-32)

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether

the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.

Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

**VI.  ANALYSIS:  Whether the ALJ failed to properly weigh the opinion of Plaintiff's treating physician**

Plaintiff argues that the ALJ erred by failing to give appropriate weight to Plaintiff's treating physician Dr. Queen-Williams, which resulted in an RFC that is not supported by substantial evidence.  The Court disagrees.

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Meece v. Barnhart*,

13

2006 WL 2271336 at * 4 (6th Cir. Aug. 8, 2006); 20 C.F.R. § 404.1527(c)(2).  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 2006 WL 2271336 at * 4 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.).  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408.[4]

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5).  *See also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold.  First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore

---

[4]     Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

14

'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.[5]

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that

---

[5] "On the other hand, opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. 20 C.F.R. § 404.1527(c). Other factors 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion. *Id.* § 404.1527(c)(6)." *Gayheart*, 710 F.3d at 376.

15

support a medical source's statement that one is disabled.  "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."  *Id*.  It is the Commissioner who must make the final decision on the ultimate issue of disability.  *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

In the present case, Plaintiff maintains that the ALJ erred by failing to provide good reasons for affording Dr. Queen-Williams's opinion less than controlling weight.  Further, Plaintiff asserts that when assigning little weight to Dr. Queen-William's opinion, the ALJ failed to adequately address the factors described in 20 C.F.R. § 404.1527(c)(2).

The Court disagrees with the Plaintiff's arguments.  The ALJ properly assessed Dr. Queen-William's opinion and provided good reasons for affording it less than controlling weight.  First, review of the administrative decision reveals that the ALJ considered Dr. Queen-Williams's treatment notes at length and summarized the details of a number of visits from late 2011 through 2012.  (Tr. 23).  The ALJ went on to accurately describe Dr. Queen-Williams medical opinion:

> In terms of specific work-related abilities, the treating psychiatrist opined nearly categorically that the claimant would be "unable to meet competitive standards" in the area of "mental abilities and aptitudes needed to do unskilled work," and she found him "seriously limited" even in understanding, remembering and carrying out "very short and simple instructions" and making simple work-related decision" (Ex. B7F/4-5).  In work-related social functioning, Dr. Queen-Williams found the claimant unable to maintain socially appropriate behavior and seriously limited in abilities to travel in unfamiliar places and to interact appropriately with the general public.  More generally, she found mildly restricted activities of daily living; marked difficulties in social functioning; "extreme" difficulties in maintaining concentration, persistence or pace; and four or more repeated episodes of decompensation, each of extended duration (Ex. B7F/6). She opined that he would be absent more than four days of work each month.

The Court disagrees with Plaintiff's argument that the ALJ failed to properly consider

whether the Dr. Queen-Williams's opinion was supported by the record.  The ALJ clearly

reasoned that Dr. Queen-Williams's opinion should be afforded little weight because "it is

inconsistent with substantial evidence in the case record, including her own office treatment

notes."  (Tr. 28).  This conclusion is adequately supported with specific evidence from the

record, as the ALJ pointed out that Dr. Queen-Williams's opinion that Plaintiff's functioning

"drastically declines" when he is manic is inconsistent with treatment notes showing that

Plaintiff was only mildly hypomanic, or, as stated in the treatment note, "a little hypomanic."

The ALJ further indicated that Dr. Queen-Williams's opinion is inconsistent with treatment

notes which reflect "generally mild to no clinical abnormalities in mood for anxiety, euphoria, or

anger."  (Tr. 28).  Plaintiff's disagreement with the ALJ's evaluation of the opinion is not

tantamount to the ALJ failing to adequately consider the opinion.

        Indeed, in terms of supportability, the Court's review of Dr. Queen-Williams's

treatment notes reveals that her opinion was inconsistent with her treatment notes, as mental

status examinations of Plaintiff were generally normal.  In January, February, May, July, and

September of 2012, notes relating to mood and affect are unremarkable.  (Tr. 310-11, 313-14,

316-17, 319-20, 322-23).  It was routinely noted that Plaintiff's appearance was appropriate, his

activity was normal; eye contact was normal; demeanor was spontaneous and pleasant; level of

consciousness was alert; judgment was fair; and insight was good.  (*Id.*).  Dr. Queen-Williams

consistently found that Plaintiff was oriented to person, time, place, and situation; and he showed

no memory disturbance.  (*Id.*).  Plaintiff consistently showed no signs of depression, anhedonia,

anxiety, or anger.  (*Id.*).  The ALJ described this evidence in the administrative opinion, and

reasonably concluded that "[t]hese longitudinal clinical signs are simply not supportive of

17

marked difficulties in social functioning or extreme difficulties in the ability to maintain

concentration, persistence or pace for even unskilled work activity consisting of simple and

routine tasks."[6]  (Tr. 28).

The ALJ also properly reasoned that Dr. Queen-Willliams's opinion that Plaintiff had

marked difficulties in social functioning and frequent mood changes that interfere with social

functioning is not borne out by the record.  (Tr. 29).  As noted by the ALJ, despite being "a little

hypomanic," Plaintiff was able to engage in numerous social activities outside the home.  (Tr.

25).  For example, the ALJ cites evidence that Plaintiff attended group yoga classes three times a

week (Tr. 62); he did odd jobs for pay (Tr. 59-60); he was working part-time four days a week as

a handy man at a daycare center (Tr. 266); he was volunteering for Habitat for Humanity; he

interacted daily by text message with former co-workers, a cousin, his parents, and friends

(Tr.58); he would visit his parents several times a week (Tr.58-59); he would visit a friend who

owns a record store and another friend who owns a restaurant (Tr. 60-61); he would visit the

judge from mental health court (Tr. 60); and he was going to school; among other things.  (Tr.

23).

While Plaintiff is correct that Dr. Queen-Williams stated in her treatment notes that

Plaintiff suffered from moderate to severe psychosocial stressors, the only medical records

---

[6]    On the other hand, as noted by the ALJ, one treatment note from November 2012
stands out, as Plaintiff had experienced a manic episode and was exhibiting mixed
symptoms of mania and depression at that time.  (Tr. 28, 307).  However, as noted
by the ALJ, these symptoms occurred during a two week period that Plaintiff had
stopped taking his medication.  (Tr. 28, 307-09).  While the ALJ might have
explained more precisely why this evidence failed to provide adequate support for
Dr. Queen-Williams's opinion overall, it is reasonably clear from the ALJ's
decision that a single manic episode, precipitated by a failure to take medication,
is an insufficient basis for fully crediting Dr. Queen-Williams's opinion.

showing that Plaintiff's stressors were severe were prepared after December 2012, which is past

Plaintiff's date last insured.  (Tr. 405-07, 453, 458, 463, 467, 472-73, 478).  Treatment records

from the period relevant to this appeal indicate that Plaintiff's psychosocial stressors were

moderate.  (Tr. 311-12, 316-17, 319-320, 322-23).  Moreover, to the degree that the evidence

supported Plaintiff's psychosocial stressors, the assigned RFC in this case was reasonably

tailored to accommodate them.  Plaintiff's RFC limited him to a low-stress, static environment;

only occasional contact with supervisors; infrequent and superficial with both coworkers and the

public; no type of conflict resolution, arbitration, or negotiating; and any interaction with

coworkers would limited cooperative tasks.

  The Court rejects Plaintiff's contention that the ALJ's reference to the various social

activities of daily living listed above is an improper basis for discrediting Dr. Queen-Williams's

opinion that Plaintiff suffered from marked difficulties in maintaining social functioning.

Plaintiff cites case law for the idea that "[i]ntermittent sporadic or infrequent activity does not

constitute [the] ability to engage in substantial, gainful activity precluding establishment of

disability under [the] Social Security Act."  *See Miracle v. Celebreeze*, 351 F.2d 361, 379 (6th

Cir.1965).  Plaintiff argues that based on this language, the ALJ erred by discrediting Dr. Queen-

Williams.  The Court is unpersuaded.  First, the various social activities described above can

hardly be considered "intermittent," "sporadic," or "infrequent."  For example, there is evidence

that Plaintiff was working at the daycare four days a week, and that he visited friends and family

almost daily.  Further, under the regulations, an ALJ may consider whether a treating source

opinion is consistent with the record as a whole.  20 C.F.R. § 404.1527(c)(2).  Plaintiff's

engagement in the social activities noted above is reasonably inconsistent with Dr. Queen-

Williams's opinion that Plaintiff had marked difficulties in social functioning, and the ALJ did not err by considering them.

The ALJ further reasoned that Dr. Queen-Williams's opinion was internally inconsistent because she found that Plaintiff suffered from markedly to extremely limiting psychological impairments, but he had only mild restrictions in his activities of daily living. Plaintiff does not dispute this reason, and while perhaps not categorically inconsistent, the consistency of the limitations just noted is at least questionable, as it is not readily apparent how Plaintiff might have suffered from extreme psychological impairments while suffering from *no* restrictions in activities of daily living. This Court finds that the ALJ reasonably concluded that without any clarification from Plaintiff's treating physician, there was an apparent inconsistency between having extreme psychological impairments, on the one hand, and having no restrictions of daily living, on the other.

The ALJ also rejected Dr. Queen-Williams opinion that Plaintiff suffered from four or more episodes of decompensation, each of at least two weeks duration. (Tr. 29, 414). "Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two)." 20 CFR Pt. 404, Subpt. P, App.1, 12.00(C). The term "repeated episodes of decompensation, each of extended duration" means "three episodes within 1 year or an average of once every 4 months, each lasting for at least 2 weeks." *Id.* In this case, as noted by the ALJ, Plaintiff was not hospitalized or seen by Dr. Queen-Williams on an emergent basis for his mood swings. The record does not support the idea that Plaintiff's bipolar disorder resulted in such serious exacerbations of symptoms. Therefore, the ALJ properly discounted this portion of Dr. Queen-

20

Williams's opinion.

Plaintiff also contends that the ALJ's reasoning was deficient because she failed to adequately consider the factors described at 20 C.F.R. § 404.1527(c)(2).  Specifically, Plaintiff maintains that more weight should have been assigned to Dr. Queen-Williams given the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, the treating source's specialization, and the opinion's consistency with the record as a whole.  The Court disagrees.  First, the ALJ appropriately recognized, and there is no dispute, that Dr. Queen-Williams was a treating source and that she had a longitudinal view of Plaintiff's condition.  However, although the opinion of a treating physician is generally entitled to deference, it must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris*, 756 F.2d at 435.  In this case, as described above, the ALJ reasonably determined that Dr. Queen-Williams's opinion was lacking in supportability as it was inconsistent with her own treatment notes and the record as a whole.

//

//

//

//

//

//

21

## VII. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.


                                     *s/ Jonathan D. Greenberg*
                                     Jonathan D. Greenberg
                                     United States Magistrate Judge

Date: April 6, 2017


### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**